[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12599

_____

D. C. Docket No. 05-01149-CV-ORL-22-KRS

ELAINE WEBB-EDWARDS,

Plaintiff-Appellant-
Cross-Appellee,

versus

ORANGE COUNTY SHERIFF'S OFFICE,

Defendant,

KEVIN BEARY, in his official capacity
as Orange County Sheriff,

Defendant-Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(April 22, 2008)**

Before EDMONDSON, Chief Judge, HILL and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

Elaine Webb-Edwards has appealed from the final judgment entered against her rejecting each of the claims set forth in her amended complaint. She contends that the District Court erred in granting Sheriff Kevin Beary's ("the County") motion for a summary judgment dismissing her claims for sexual harassment. In granting the motion, the District Court concluded that Ms. Webb-Edwards did not demonstrate that she was subjected to suffering pervasive harassment to constitute a hostile and adverse work environment.

She also challenges the District Court's conclusion that the record showed that the County exercised reasonable care to prevent and correct any sexual harassing behavior, and that Ms. Webb-Edwards unreasonably failed to take advantage of her employers corrective measures or to avoid any harm to her. Ms. Webb-Edwards also seeks reversal of the dismissal of her retaliation claim based on the District Court's determination that she failed to demonstrate that the decision not to appoint her as the School Resource Officer ("SRO") at the Gateway Middle School was based on her gender.

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

In addition, Ms. Webb-Edwards seeks reversal of the order granting judgment as a matter of law, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, of her claims for her gender discrimination and constructive discharge. After reviewing the record, we are persuaded that the District Court did not err and conclude that the judgment must stand.

**I**

**A**

The District Court granted the County's motion for summary judgment dismissing Ms. Webb-Edwards's sexual harassment based on the evidence presented to it by the parties at that stage of the proceedings. The facts set forth in Ms. Webb-Edwards's opposition demonstrate that she was hired by the Orange County Sheriff's Office in July 1995 as a deputy sheriff. In May 2000, she was assigned to the property division.

In February 2004, Sgt. Richard Mankewich was transferred to the Sector 1 property unit. He was assigned to supervise Ms. Webb-Edwards and four other detectives. Lt. Joseph Picanzo oversaw Sgt. Mankewich's performance.

Beginning the first week Sgt. Mankewich transferred to Sector 1, he started making comments to Ms. Webb-Edwards that she felt were inappropriate and sexual in nature. For example, Ms. Webb-Edwards alleged that he would say to

3

her "that looks hot or you look hot." Sgt. Mankewich also told her that she "looked hot, but it would look better if you'd wear tighter clothes."

Similar comments were made once a week and on occasion twice a day. When Ms. Webb-Edwards asked how his wife was doing, Sgt. Mankewich replied: "She'd be better if she'd wear tighter clothes." On one occasion, Ms. Webb-Edwards submitted a request for time off. Sgt. Mankewich replied: "Well, if you start wearing tighter clothes, then you'll get it." He also stated to Ms. Webb-Edwards at a meeting where other detectives were present: "You know, Elaine, women who change their hair color usually have issues at home." In response to Sgt. Mankewich's unwelcome comments, Ms. Webb-Edwards testified in her deposition that she told him to stop, or that he was sick, or just walked away to try to avoid him.

In her deposition, Ms. Webb-Edwards testified that when she and Sgt. Mankewich were in the car together driving to take a witness's statement, her husband telephoned her, and asked her if she had lunch plans. Before she could reply, Sgt. Mankewich grabbed the telephone and told her husband: "I don't know what you're saying, but I'm eating your wife."

On April 20, 2004, Ms. Webb-Edwards told Sgt. Mankewich, in a closed-door meeting in his office, that his comments made her feel uncomfortable. He

4

told her that if she reported him, she would not "be getting any other position."

After that conversation, Sgt. Mankewich did not make any further comments about her appearance, but he continued to look at her in a way she deemed inappropriate.

On April 21, 2004, Ms. Webb-Edwards met with Lt. Mike McKinley. She told him about Sgt. Mankewich's comments about wearing tighter clothes. She did not tell him about Sgt. Mankewich's crude comment to her husband. After hearing Ms. Webb-Edwards's allegations, Lt. McKinley immediately moved her workplace to a different office about twenty minutes away from Sector 1 while her complaint against Sgt. Mankewich was investigated.

Several days later, Ms. Webb-Edwards met with Lt. Picanzo. She repeated the allegations she related to Lt. McKinley. She did not disclose Sgt. Mankewich's lunch comment to Lt. Picanzo. Lt. Picanzo stated that Sgt. Mankewich had supervision problems and needed training to correct them. The next day Lt. Picanzo met with Ms. Webb-Edwards, Sgt. Mankewich, and Captain Tom Foster. The purpose of the meeting was to address Sgt. Mankewich's supervisory problems. Lt. Picanzo arranged a second meeting with Ms. Webb-Edwards, Detective Chris Saccano, and Sgt. Mankewich. After attending this meeting, Ms. Webb-Edwards agreed to return to her regular shift under Sgt. Mankewich's supervision. Her benefits and wages were not changed.

Around May 10, 2004, Ms. Webb-Edwdards's husband informed Sgt. Dennis Strange that Sgt. Mankewich's made comments about "tight clothes." Ms. Webb-Edwards's husband was also employed as a deputy sheriff with the Orange County Sheriff's Office. Officer Edwards told Sgt. Strange about Sgt. Mankewich's crude comment about eating his wife for lunch.

On May 11, 2004, Sgt. Strange wrote a memorandum setting forth Officer Edwards's report. He also confirmed the details of the conversation with Ms. Webb-Edwards. Sgt. Strange's memorandum was addressed to Chief Ron Stucker in the Professional Standards Division. The next day, Daniel W. Ford, the Director of Human Resources, held a meeting with Ms. Webb-Edwards and Captain Tom Foster to address her complaint against Sgt. Mankewich. Ms. Webb-Edwards informed Director Ford, and Captain Foster that she had not informed Lt. McKinley about the lunch comment. At the meeting, Director Ford told Ms. Webb-Edwards that she had several options. She could either stay in Sector 1 under Sgt. Mankewich's supervision or transfer to Sector 3. Director Ford also advised her that he would facilitate mediation between Ms. Webb-Edwards and Sgt. Mankewich. Ms. Webb-Edwards agreed to participate in mediation if she could keep her same work schedule, transfer to Sector 3, and receive an apology letter from Sgt. Mankewich. On May 23, 2004, Ms. Webb-Edwards was

transferred to Sector 3.  In addition to maintaining the benefits and hours she had in Sector 1, she was further accommodated to have Wednesdays off.  Sgt. Mankewich wrote a letter apologizing for his behavior.

On June 18, 2004, Ms. Webb-Edwards mailed a letter to Director Ford in which she stated that she wanted to pursue mediation with Sgt. Mankewich.  She also informed Director Ford that she was in a "positive atmosphere where there [was] mutual respect."  During the rest of her employment in the Orange County Sheriff's Office, she did not complain of inappropriate conduct by Sgt. Mankewich.

**B**

On August 8, 2005, Ms. Webb-Edwards filed a complaint against the Orange County Sheriff's Office.  She alleged in Count I that she was discriminated against "on the basis of sex, and the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000(e) *et seq*."  In paragraphs numbered six through ten of Count I, she alleged that she was subjected to sexual harassment by Sgt. Mankewich.  In paragraph 11 of Count I, she alleged that, "Defendant discriminated against the Plaintiff as to the terms and conditions of her employment on the basis of her sex in violation of Title VII.  Plaintiff incorporates by reference paragraph 19.f. in Count II as if fully set forth herein."  In paragraph

7

19.f. of Count II, Ms. Webb-Edwards alleged that the denial of a position as a SRO was "both discriminatory and retaliatory" due to the complaints she made against her supervisor because of Sgt. Mankewich's sexual harassment. In Count III, she alleged a common law action for negligent retention.

On August 15, 2005, the County filed a motion to dismiss the complaint on the ground that the Orange County Sheriff's Office is not a party capable of being sued under Florida law. On August 29, 2005, Ms. Webb-Edwards filed a motion to substitute the name of Kevin Beary, in his official capacity as the Sheriff of Orange County for the named defendant. The District Court granted the motion to substitute the party defendant and dismissed the Orange County Sheriff's Office's motion as moot.

On September 7, 2005, Ms. Webb-Edwards filed an amended complaint. The initial paragraph reads as follows: "Plaintiff, Elaine Webb-Edwards, files this her Amended Complaint against Defendant, Kevin Beary, in his official capacity as Orange County Sheriff for sexual harassment retaliation, and negligent retention." This statement did not allege gender discrimination. The allegations in Count I, II, and III were the same as those set forth in the original complaint.

On September 16, 2005, the County filed its answer to the amended complaint. It denied the truth of the allegations set forth in paragraphs six, seven,

8

eight, nine, ten, eleven, and 12. The County admitted that "Plaintiff's Amended Complaint purports to state a cause of action under Title VII of the Civil Rights Act of 1964 for harassment on the basis of sex." The answer does not refer to gender discrimination. However, as noted above, he denied the allegations set forth in paragraph 11 of Count I.

On September 29, 2005, the District Court dismissed the negligent retention claim *sua sponte*.[1]

On November 3, 2005, the County filed a motion for summary judgment. It asserted that Ms. Webb-Edwards had failed to establish a genuine issue of material fact as to her claim of sexual harassment or retaliation, as alleged in Count I and Count II of the amended complaint. In the introduction to its motion, the County stated that "Plaintiff Elaine Webb-Edwards's (hereinafter "Plaintiff") Amended Complaint seeks to hold Kevin Beary, in his official capacity as Orange County Sheriff liable for hostile work environment sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII")."

The County also asserted that all employment actions taken by Sheriff Beary were for legitimate business reasons. It also alleged as an affirmative defense that the County maintains and enforces a policy against harassment and retaliation and

_____

[1] Ms. Webb-Edwards has not appealed from the dismissal of the negligent retention claim.

9

provides to employees a mechanism through which to address such claims. The County argued that her failure to invoke and exhaust these available remedies bars her claims.

On December 1, 2006, Ms. Webb-Edwards filed her trial brief in this action. She asserted therein that "[t]he plaintiff has a two-count lawsuit. Count I is for gender discrimination which encompasses both sexual harassment and failure to place Plaintiff in an SRO position. Count II is for retaliation which ultimately resulted in constructive discharge."

On December 4, 2006, Ms. Webb-Edwards filed a memorandum in opposition to the County's motion for summary judgment. She noted that the County "has only addressed the sexual harassment position and not the refusal to place the Plaintiff in a SRO position, see paragraph 11 of the Amended Complaint. The failure to place the Plaintiff in the SRO position is also a key element of Count II, the retaliation claim."

On December 8, 2006, the County filed a motion to strike the allegations of gender discrimination in Ms. Webb-Edwards's trial brief and her response to his motion for summary judgment. It asserted that "Plaintiff has alleged gender discrimination regarding not being offered the Gateway Resource Officer (Gateway "SRO") position for the first time during this litigation." The County

further asserted that gender discrimination was not alleged in Ms. Webb-Edwards's EEOC charge, nor was it alleged in her amended complaint with the specificity required by Rule 8(e) and Rule 10(b) of the Federal Rules of Civil Procedure. It contended that commingling two causes of action in one count violated Rule 10(b). Ms. Webb-Edwards filed an opposition to the motion to strike in which she asserted that a gender discrimination claim was set forth in paragraph I of the amended complaint.

The District Court granted the County's motion for summary judgment as to Ms. Webb-Edwards's sexual and retaliation causes of action. The District Court denied the County's motion for summary judgment regarding the gender discrimination cause of action. It concluded that "[t]here are sufficient issues for trial in Plaintiff's complaints for gender discrimination by sexual harassment, gender discrimination by failure to place the Plaintiff in an SRO position and retaliation resulting in constructive discharge." It also denied the County's motion to strike the allegation of gender discrimination. The Court agreed with the County that "Plaintiff's Amended Complaint is poorly organized and difficult to read." It concluded, however, that the County's argument was untimely because he "[s]hould have made this argument in response to the Amended Complaint." The District Court stated that the gender discrimination claim is alleged in the amended

complaint, therefore the County was on notice of that cause of action. The District Court ordered the parties to refile their pretrial statements "focusing on the only remaining issue to be tried, gender discrimination."

## C

Ms. Webb-Edwards testified during the trial that on July 27, 2004, the Orange County Sheriff's Office posted an announcement of a vacancy in the position of SRO. Ms. Webb-Edwards met the qualifications for the position. She applied for the position on or about August 4, 2004.

Prior to becoming a law enforcement officer, M. Webb-Edwards was a campus advisor at Sea Breeze High School. She served in liaison capacity for the school with the SRO. She patrolled with the SRO to break up fights and make sure students were in school. She also was the head coach of the boys' volleyball team, and the girls' softball team.

Ms. Webb-Edwards was interviewed on September 9, 2004, for a SRO position before a three-person transfer review board. After interviewing each of the applicants, the board tallied up the scores and ranked the four applicants. Ms. Webb-Edwards was ranked second.

SRO positions were available at Piedmont Lakes and Gateway Middle School at that time. The person who was ranked first received an appointment to

Piedmont Lakes. Ms. Webb-Edwards received a memorandum dated October 25, 2004, that the position at Gateway Middle School had been filled. Prior to receiving this memorandum, Ms. Webb-Edwards had been informed by several officers that she would not be appointed to serve as the SRO at Gateway Middle School, notwithstanding the fact that she was number two on the list of successful applicants.

Ms. Webb-Edwards attempted to contact Director Ford by telephone. He did not reply. On October 22, 2004, she sent an e-mail to Director Ford in which she stated she wanted to talk to him because she "was having some issues." On October 28, 2004, she went to Director Ford's office and spoke to his secretary. She told her that she had been passed over for the SRO position at Gateway Middle School. She requested that Director Ford telephone her. Director Ford did not call her.

On November 9, 2004, Ms. Webb-Edwards sent a letter of resignation to Director Ford at 2:23 p.m. to be effective on December 31, 2004. In her memorandum, she requested a meeting with a representative from Director Ford's office to discuss changing her insurance and other matters regarding her "early retirement."

Ms. Webb-Edwards testified that she decided to resign because "she was emotionally a wreck." Her physician stated her medical condition was "stress related."

Less than two hours later, at 4:10 p.m., Ms. Webb-Edwards received an e-mail from Director Ford. It stated as follows:

> Elaine: Commander Chatman, and I tried to contact you this afternoon to advise you we are working on a resolution to the issues of your transfer to an SRO position. Before I accept your resignation and we finalize this matter, I would like to talk to you about it. Please call me on my cell phone.

Ms. Webb-Edwards testified that she did not call Director Ford as he had requested because she was emotionally upset and the e-mail did not change her decision to resign. Prior to receiving Director Ford's memorandum, Commander Julia Chatman had orally offered her the SRO position at Conway Middle School.

At 5:18 p.m., Director Ford sent another e-mail to Ms. Webb-Edwards. It reads as follows:

> Elaine, I just spoke with Commander Chatman. She advised me that she has spoken to you and offered you the position as SRO at Conway Middle School. This has been approved by Chief Hollomon and Undersheriff Stewart. I know Julia has expressed to you, as well as myself, her desire to have you come to work for her. Please take a couple of days to think about this and call Julia back and let her know whether you would like to have the position in lieu of resigning. I realize you told

14

> her tonight you did not want the position, but I will still like for you to think about it. So, please take a few days to make your final decision. If you would like to speak with me about it tomorrow, please call me on my cell phone at 407. . ., or call Maria and give her a number where you can be reached, and she will track me down. I am going on personal leave beginning on Thursday, so please call me tomorrow.

Ms. Webb-Edwards did not withdraw her letter of resignation. She was not told that her employment would be terminated because she had tendered her resignation. Her last day at work was December 12, 2004. She remained on the payroll until January 4, 2005 because she had accumulated vacation time.

Ms. Webb-Edwards was aware that the Orange County Sheriff's Office had a policy that permitted employees to complain about gender discrimination. She did not file a written complaint about gender discrimination.

Ms. Webb-Edwards testified that, had she not resigned, she would have continued to be employed as a property detective in Sector 3 at the same salary and benefits. She was not requested to resign from that position because of her refusal to accept a transfer to serve as a SRO at the Conway Middle School.

Commander Chatman testified that the ratings of the four applicants for the SRO position were approved by Sheriff Beary. The position at Gateway Middle School was offered to Deputy Sheriff John Leone who was ranked number 3 on the

15

list of applicants. The failure to transfer Ms. Webb-Edwards to the SRO position at Gateway Middle School was a deviation from the rankings.

Commander Chatman was informed by Ms. Webb-Edwards that she had been bypassed on November 9, 2004. Ms. Webb-Edwards also informed Commander Chatman on the same date that she had submitted her resignation on November 9, 2004. Commander Chatman informed Director Ford of Ms. Webb-Edwards's conversation later that day. Commander Chatman told Director Ford she thought Ms. Webb-Edwards had been treated unfairly in being passed over because she was a female.

Commander Chatman testified that Chief Jim Hollomon was the decision maker regarding the filling of SRO positions. She stated that an applicant for an SRO position does not apply for a particular school. A deputy can be assigned to any SRO position that becomes available. If an applicant denies a SRO position that is offered to him or her, he or she is taken off the list to avoid "shopping around." If an applicant is transferred to a SRO position at a particular school, he or she may be laterally transferred to another school.

Commander Chatman testified that at schools other than Gateway Middle School, a SRO's duties include teaching "gang resistance" to the students. At Gateway Middle School, however, a SRO does not have time to teach "because

16

you're going from classroom to classroom or breaking up a fight in the hallway or assisting in the office with a student that either has--acted out is how they use the word. So, you really don't have time to actually give instructions." She further testified that the duties of a SRO at Gateway Middle School are different from those performed at Conway Middle School.

Commander Chatman also testified that a majority of the students at Gateway Middle School have "criminal charges" and psychological or behavioral problems. A majority are also on medication. At one point, Commander Chatman recommended that two deputies be assigned to Gateway Middle School "for safety reasons."

Commander Chatman testified that when she informed Director Ford that Ms. Webb-Edwards has been bypassed, he became upset. He telephoned Chief Hollomon. He told Chief Hollomon "Jim, you know I can't do that. That's why we have a process." Within an hour or two, the Undersheriff or Chief Hollomon informed Director Ford that another position was open to offer to Ms. Webb-Edwards.

Director Ford instructed Commander Chapman to contact Ms. Webb-Edwards and offer her the SRO position at Conway Middle School. When Commander Chatman reached Ms. Webb-Edwards, Commander Chatman was told

that the offer was too late and Director Ford would have to speak to her attorney. Commander Chatman tried to convince Ms. Webb-Edwards to accept the Conway Middle School SRO position because "she would be a good asset to the kids, because we needed good school resource officers. We needed some good SRO models."

Chief Jim Hollomon was called as an adverse witness. Chief Hollomon testified that he was the final decision maker in placing SRO applicants. He testified that ordinarily he would appoint disputes to a SRO position according to the ranking by the transfer review board. Ms. Webb-Edwards was not transferred to the SRO position at Gateway Middle School although she was eligible as the second ranked applicant, notwithstanding the fact that the transfer review board's ranking was initially approved without deviation.

Chief Hollomon testified he made the decision to deviate from the ranking in filling the SRO vacancy at Gateway Middle School because "[s]he was not the most qualified person for the position off the list." He stated that "Gateway was a final step for students with severe behavioral problems, and they weren't able to function safely in a regular school environment. He asserted that his criteria for that assignment required someone who was "very physically imposing" and "had the tactical background to handle that position" at Gateway Middle School. He

18

concluded that Deputy Sheriff Leone was qualified because he had been a SWAT team officer and was an instructor in defensive tactics. Chief Hollomon testified that "out of the four candidates I saw only one that qualified." If Deputy Sheriff Leone declined the position, he planned to repost it for other applicants.

Chief Hollomon testified on cross-examination that he was looking for someone who was physically imposing to fill the SRO position at Gateway Middle School because

> Gateway is a very unique situation. The student population there, you know, ranges from 12 to 22 years old. These are students who cannot function in a regular school atmosphere. They have – a lot have criminal records, arrest records, and emotional problems that pose a serious officer safety threat.

Chief Hollomon testified that he was concerned for the safety of the officer assigned to Gateway Middle School. He would also not put some males at Gateway Middle School because "they're simply not up to the task. This is a special, special situation. And the more physically imposing and tactically sound the person is at Gateway, the less problems you're going to have." Chief Hollomon testified that he would not have assigned the male who placed number one on the list at Gateway Middle School because he lacked the "[p]hysical stature and tactical background and training."

19

Chief Hollomon requested Undersheriff Stewart Malone's permission to deviate from the list to select a person with the special skills needed to handle students with behavioral and medical problems. Sgt. Linda Newcome prepared a memorandum dated March 5, 2004, that identified the significant problems at Gateway Middle School. Chief Hollomon testified that

> Gateway was a final step for students with severe behavioral problems, and they weren't able to function safely in a regular environment, students with severe conduct or emotional disorders. Sixty percent of those students are on medication, which include antipsychotic drugs, stimulants, antidepressants and mood stabilizers. Fifty percent of the students are clinically depressed.

He also testified that some of the male students were larger than the adults on campus. Their ages ranged from fourteen to twenty-two. Many of the students had criminal histories. Sixty percent of the students were on probation for armed robbery, carjacking with a firearm, battery on a law enforcement officer, and other violent crimes. Forty-three students had been arrested on the Gateway Middle School campus for battery on a law enforcement officer, battery on a school employee, or possession of weapons and drugs. Chief Hollomon had previously recommended that more than one SRO officer should be assigned to Gateway Middle School and additional civil security guards were also needed. Chief Hollomon testified that the position was offered to Deputy Sheriff Leone, who had

20

placed number four on the list. Deputy Sheriff Leone had been on the Orange County Sheriff's Office's SWAT team. Chief Hollomon was also aware that Deputy Sheriff Leone had been an instructor in defensive tactics. Deputy Sheriff Leone did not accept the SRO position at Gateway Middle School. Chief Hollomon knew that Ms. Webb-Edwards was a property detective. He had seen her in the gym. He would not have appointed a male to serve as a SRO at Gateway Middle School of Ms. Webb-Edwards's size and weight.

Chief Hollomon was aware that Ms. Webb-Edwards had been offered a position at Conway Middle School. He described that school as follows:

> Conway is a school that you'd want your son or daughter to attend. It is a very good atmosphere. The School Resource Officer there has an opportunity to make a difference through counseling, mentoring, teaching, coaching, doing all the after-school activities. It's a very positive place to be as opposed to Gateway which is controlled chaos.

Chief Hollomon approved the offer of the position at Conway Middle School to Ms. Webb-Edwards because he felt "she would be a good fit there at Conway Middle School." The pay and the benefits there were the same.

Ms. Webb-Edwards was not disciplined for refusing the SRO position at Conway Middle School. Chief Hollomon testified that he did not believe he

discriminated against Ms. Webb-Edwards by bypassing her from being placed as a

SRO at Gateway Middle School.  He described his motivation as follows:

> I have no personal agenda here.  My consideration is to put the best qualified person in a position.  Gateway Middle School is a horrible place to work.  I tried to put the person that I thought would probably go there, do a good job and more than anything else be safe.  My intention really was to protect Elaine.  I didn't think that was a good place to put her.  I think other people– like I said, the physically imposing, tactically sound people are better.  The way I look at things is this: Officer safety first, last, and always.  And that's how I make my decisions.

Ms. Webb-Edwards testified that when she entered the police academy it

was her intention to become a SRO at Sea Breeze High School where she had

previously worked as a campus advisor.  During that employment she was assigned

to work with the SRO.

When she was notified that she would not be transferred to Gateway Middle

School she was upset.  She began to have chest pains.  She went to a doctor in late

October because she thought she had a heart condition. After she had a CAT scan

of her heart, her physician determined her heart was functioning fine.  He opined

that her symptoms were stress-related.  She also had a rash on the palm of her

hand, the inside of her arms, and under and over her eyes.

22

Ms. Webb-Edwards testified that she decided to resign on November 9, at 2:23 p.m. because:

> I realized that the job that I had worked so hard for and done very well at and proven myself over and over and over again, was never going to be enough, because – and also the fact that the chain of command had really let me down. I believed in that. I've always believed as a law enforcement officer, in justice and always believed that the Orange County Sheriff's Office was going to do the right thing, and I realized that wasn't going to happen that no matter how hard I worked, it just wasn't enough.

At 5:18 p.m., on the same date, approximately three hours after she submitted her letter of resignation, Director Ford offered her the position as SRO at Conway Middle School. Ms. Webb-Edwards testified that this offer was "too little too late."

Ms. Webb-Edwards testified that she sought counseling for her condition in May 2005 from a psychologist approximately six months after she resigned. The psychologist referred her to Dr. Manuel Mota-Castillo who is a psychiatrist.

Dr. Mota-Castillo testified that he first treated Ms. Webb-Edwards in May 2005. He testified that "she told me that for one year she has been trying to stop worrying about what happened at work." His notes revealed that she stated: "Emotionally I have been a wreck. Not sleeping due to worries." Based on her history, Dr. Mota-Castillo diagnosed her as having an adjustment disorder with

mixed emotional conditions due to her situation at work. He testified that an adjustment disorder is a transient event. Dr. Mota-Castillo stated that her prognosis was guarded because "she will need to find a solution to her situation for her mental status to change." Dr. Mota-Castillo prescribed some medicine to help her cope with stress and depression.

Ms. Webb-Edwards told Dr. Mota-Castillo that "she was more interested in an apology than in getting money, that she would be frustrated if she just got a payment and no apology." Dr. Mota-Castillo could not recall whether she told him that she was offered a SRO position on the day she announced her resignation. Dr. Mota-Castillo saw her four or five times between May 13, 2005, and November 16, 2005.

Gus Bextram testified that he supervised Ms. Webb-Edwards for a year and a half in 1993 and 1994 while she worked as a patrol officer at the Winter Park Police Department. He testified that she handled herself very well when she arrested a suspect who had a criminal history of violence. At the time of trial, Mr. Bextram was a coordinator for the criminal justice program at Seminole Community College. He served as a SRO officer for two years while he was a member of the Winter Park Police Department. He stated that the most important qualification for being a SRO is "to communicate with children." He opined that

an officer does not have to have military or SWAT team experience to serve as n

SRO. Mr. Bextram testified he had never been a SRO at Gateway Middle School.

Laury Ralph Edwards, Ms. Webb-Edwards's husband, testified on her behalf. At the time of trial, he had served as a deputy sheriff for the Orange County Sheriff's office for almost thirteen years. He testified that his wife had always wanted to be a SRO because she wanted to be involved with children, to take part in extracurricular activities, and utilize the skills she had learned as a campus advisor and coach before she became a law enforcement officer.

**D**

The trial in this matter commenced on March 19, 2007. After Ms. Webb-Edwards rested her case in chief, the County made an oral motion pursuant to Rule 50(a) for judgment as a matter of law for dismissal of the gender discrimination claim and the constructive discharge claim that was presented in the cause of action for retaliation. The District Court granted the oral motion regarding the constructive discharge claim. The District Court informed counsel that it would reserve making a ruling on the Rule 50(a) motion regarding the gender discrimination claim until after the jury rendered its verdict. The jury returned a verdict for Ms. Webb-Edwards on the gender discrimination claim in the amount of $500,000. Seventy-five thousand dollars was awarded for economic damages,

and $425,000 was awarded for compensatory damages. After excusing the jury, the Court permitted Sheriff Beary to supplement his Rule 50(a) motion in writing.

On March 30, 2007, the County submitted a written motion for a directed verdict on her gender discrimination claim pursuant to Rule 50(a). It asserted in its motion that Ms. Webb-Edwards's gender discrimination claim should be dismissed because she did not prove that she suffered an adverse employment action when she was passed over for the SRO position at Gateway Middle School. The County requested that if the Court denied the Rule 50(a) motion, it should enter judgment as a matter of law dismissing the award of economic damages.

Ms. Webb-Edwards filed a motion for reconsideration of the dismissal of the constructive discharge claim on April 3, 2007. On April 12, 2007, she filed an opposition to the County's written motion for a directed verdict and its motion to alter or amend the verdict, or in the alternative, for a new trial. On May 4, 2007, the District Court granted the County's Rule 50(a) motion for judgment as a matter of law and dismissed as moot its motion to alter or amend the verdict. It also denied Ms. Webb-Edwards's motion to reconsider the dismissal of her constructive discharge claim. On May 7, 2007, the clerk entered the District Court's judgment dismissing this action on the merits and awarding costs to the County. On June 1, 2007, Ms. Webb-Edwards filed a notice of appeal from the final judgment entered

26

on May 7, 2007, granting judgment in favor of the County, and the order granting its motion for summary judgment entered on February 27, 2007. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

Ms. Webb-Edwards asserts that the District Court committed reversible error in granting summary judgment in favor of the County regarding her sexual harassment and retaliation claims. We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the party opposing the motion. *See Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

> Summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Springer v. Convergy Customer Management Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (internal quotation marks omitted).

## A

Ms. Webb-Edwards contends that the District Court erred in concluding that Sgt. Mankewich's conduct was not sufficiently severe and pervasive to alter the terms and conditions of her employment and create an abusive and hostile work

environment. Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Sexual harassment is a form of sex discrimination prohibited by Title VII," *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000).

An employee must present evidence of the following elements to support a cause of action for a hostile environment claim created by sexual harassment:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).[2]

Ms. Webb-Edwards belongs to a protected group. The District Court correctly rejected as frivolous the County's contention that Sgt. Mankewich's

---

[2] [A]n employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate or successively higher authority over the employee-subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245 n.4.

comments to Ms. Webb-Edwards were not based on her gender. The evidence, when reviewed in the light most favorable to her, demonstrates Sgt. Mankewich's statements and conduct were unwelcome. She presented evidence that she told him to stop and that he was sick. Sgt. Mankewich's statements that she looked hot, that she should wear tighter clothes, that he wished his wife wore hot clothes, and his vulgar comment about lunch were unmistakenly gender based. It is undisputed that Sgt. Mankewich was Ms. Webb-Edwards's supervisor. Thus, Ms. Webb-Edwards clearly demonstrated that she satisfied the first, second, third, and fifth elements of her cause of action for hostile environment and sexual harassment.

Ms. Webb-Edwards asserts that the evidence she offered in opposition to Appellee's motion for summary judgment demonstrates that there are genuine issues of material fact in dispute regarding whether Sgt. Mankewich's sexual comments were sufficiently severe and pervasive to alter the terms and conditions of her employment.

> [W]hether an environment is hostile or abusive can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

29

Before this Court, the County does not dispute that Sgt. Mankewich's comments were discriminatory. Sgt. Mankewich made gender related comments on at least a weekly basis, over an eight-week period. The record also shows, however, that when Ms. Webb-Edwards told Sgt. Mankewich on April 20, 2004, that his comments made her feel uncomfortable, his discriminatory conduct ceased. Furthermore, when she reported to Lt. McKinley that Sgt. Mankewich's comments were unwelcome, she was immediately and temporarily moved to a different workplace while her complaint was investigated.

After attending two meetings with her supervisors and Sgt. Mankewich, Ms. Webb-Edwards agreed to return to her former workplace under Sgt. Mankewich's supervision. Her employer was not informed of Sgt. Mankewich's reprehensible comment about eating Ms. Webb-Edwards for lunch until her husband informed Sgt. Strange about that behavior on or about May 10, 2004. The day after receiving Sgt. Strange's memorandum, Director Ford met with Ms. Webb-Edwards. Director Ford told her she could remain in Sector I under Sgt. Mankewich's supervision or transfer to Sector 3 with no change in her salary or work shift. She elected to accept a transfer to Sector 3 so that she would not be supervised by Sgt. Mankewich. She also requested that Sgt. Mankewich apologize

for his gender based comments in writing. Her request was granted. She was transferred to Sector 3 and Sgt. Mankewich apologized in writing.

Sgt. Mankewich's comments that Ms. Webb-Edwards "looked hot," and that she should wear tighter clothing, and women who dye their hair have issues at home were taunting and boorish. They were not, however, physically threatening or humiliating. Sgt. Mankewich never touched her or attempted to do so. For conduct to be severe or pervasive, the work environment must be one that a reasonable person would find hostile or abusive. *Oncale v. Sandowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

The Supreme Court has cautioned against expanding Title VII into "a general civility code." *Id.* at 81. The Court instructed in *Oncale* that

> The statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace, it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.

*Id.*

We are persuaded that a reasonable person would not consider Sgt. Mankewich's comments about Ms. Webb-Edwards's figure and good looks severely hostile or abusive. Ms. Webb-Edwards has failed to demonstrate that Sgt.

31

Mankewich's inappropriate comments about Ms. Webb-Edwards's appearance unreasonably interfered with her work performance or the terms and conditions of her employment.

Sgt. Mankewich's taunting jest about eating Ms. Webb-Edwards for lunch is more troubling. It was directed at her husband in Ms. Webb-Edward's presence. The record shows, however that she did not report it to Lt. McKinley on April 21, 2004, when she complained about Sgt. Mankewich's unwelcome comments about her appearance. Her husband made a report of the lunch comment on June 10, 2004. Furthermore, it is the only comment that could be construed as referring to sexual activity involving Ms. Webb-Edwards. It was rather clearly a disgusting attempt at humor, unaccompanied by any other improper conduct.

The Supreme Court held in *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998), that "offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." In *Gupta*, this Court noted that:

> [a]ll the sexual hostile work environment cases decided
> by the Supreme Court has involved patterns or
> allegations of extensive, long lasting, unredressed and
> uninhibited sexual threats or conduct that permeated the
> plaintiff's work environment.

*Gupta,* 212 F.3d at 586 (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999)). In this matter, the record shows that Ms. Webb-Edwards's employer took immediate action to redress her grievances by granting her request to be transferred to a different office and required Sgt. Mankewich to apologize for his behavior.

After looking at the totality of the circumstances independently, we agree with the District Court that Ms. Webb-Edwards failed to demonstrate that Sgt. Mankewich's boorish remarks were severe or pervasive. They did not alter the terms and conditions of her employment. The District Court did not err in granting summary judgment on Ms. Webb-Edwards's sexual harassment claim.

B

Ms. Webb-Edwards further contends the District Court erred in concluding that she failed to demonstrate that she was not transferred to Gateway Middle School in retaliation for the fact that she complained about Sgt. Mankewich's gender related comments. The District Court held that she failed to present evidence that the failure to transfer her to a SRO position at Gateway Middle School was causally related to the prior exercise of her statutorily protected rights under Title VII to complain about workplace harassment. "[T]o establish a prima facie case of retaliation under 42 U.S.C. § 2000(e) - 3(a), a plaintiff must show that

33

(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998).

Ms. Webb-Edwards complained to Lt. McKinley on April 21, 2004, about Sgt. Mankewich's comments about her appearance and clothes. On October 25, 2004, Ms. Webb-Edwards was informed by an employee of the Human Resources Division that the Piedmont Lakes SRO position had been filled but that the list was still open for future transfers. Accordingly, approximately six months elapsed between the date Ms. Webb-Edwards first complained about Sgt. Mankewich's unwelcome comments and the date she was noted that she was passed over for transfer to Gateway Middle School.

The record shows that Chief Hollomon deviated from the transfer board's ranking because he was concerned that female officers or small male officers would be subject to violent physical assaults by the many disturbed students at Gateway Middle School. Division Chief Hollomon was aware that Ms. Webb-Edwards had complained about workplace harassment. No evidence was presented by Ms. Webb-Edwards that Chief Hollomon's testimony that his motivation for deviating from the transfer board's ranking of Ms. Webb-Edwards was false or pretextual. Instead, she relies on the close temporal connection between the two

34

events to demonstrate the element of causal connection. The Supreme Court noted

in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001), that:

> the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). See, e.g. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) *274 4-month period insufficient). Action taken (as here) 20 months later suggests by itself, no causality at all.

*Id*.

Here, Division Chief Hollomon's decision to pass over Ms. Webb-Edwards

in filling the position of SRO at Gateway Middle School came approximately six

months after she complained of a hostile work environment because of sexual

harassment. The District Court did not err in dismissing Ms. Webb-Edwards's

retaliation claim. Ms. Webb-Edwards failed to meet her burden of presenting

evidence of a causal connection between her complaint about Sgt. Mankewich's

inappropriate comments and to Chief Hollomon's decision not to transfer her to

Gateway Middle School.

## III

Ms. Webb-Edwards also contends that the District Court erred in granting

Appellee's motion to dismiss her gender discrimination and constructive discharge

claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

> Our review of a grant of a Rule 50(a) motion for
> judgment of a matter of law is *de novo*; we apply the
> same standard that the district court applied in addressing
> the motion.  In doing so, we consider all the evidence in
> the light most favorable to the non-moving party, and
> independently determine whether the facts and inferences
> point so overwhelmingly in favor of the movant . . . that
> reasonable people could not arrive at a contrary verdict.
>
> The non-moving party must provide more than a mere
> scintilla of evidence to survive a motion for summary
> judgment as a matter of law.  If the non-moving party
> failed to make a showing on an essential element of his
> case with respect to which he had the burden of proof,
> then the entry of judgment as a matter of law is
> appropriate.

*Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc*., 162 F.3d 1290, 1308

(11th Cir. 1998) (internal quotation marks and citation omitted).

## A

Ms. Webb-Edwards maintained that the County waived the right to raise the

absence of the adverse employment action element of its *prima facie* case because

it failed to raise this issue in its oral Rule 50(a) motion after Ms. Webb-Edwards

had presented its case in chief.  Ms. Webb-Edwards contends that the County did

not assert that she had failed to demonstrate that she had suffered an adverse employment action until it filed its written Rule 50(a) motion after the jury returned its verdict. She argues that the failure of the County to include in its oral motion the law and facts that entitled it to judgment as a matter of law violated the mandatory provisions of Rule 50(a)(2). Rule 50(a)(2) provides that: "The motion must specify the judgment sought and the law and facts that entitled the movant to the judgment."

Ms. Webb-Edwards correctly argues that this specificity requirement is necessary to protect the right of the non-moving party to correct deficiencies in the evidence before the case is submitted to the jury. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998). The County maintains that Ms. Webb-Edwards forfeited her right to require it to specify the law and facts that it was entitled to judgment as a matter of law by failing to object when the District Court interrupted the County's oral Rule 50(a) motion and ordered that it would not rule on the gender discrimination claim until after the jury returned its verdict.[3]

> In general, the law ministers to the vigilant, not to those who sleep upon perceptible rights. Consequently, a litigant who deems himself aggrieved by what he considers to be an improper occurrence in the course of

---

[3] In its written Rule 50(a) motion, the County asserted that the District Court should enter judgment as a matter of law because Ms. Webb-Edwards failed to demonstrate that she suffered an adverse employment action.

> trial or an erroneous ruling by the trial judge ordinarily must object then and there, or forfeit any right to complain at a later time. The policy reasons behind the raise-or-waive rule are rock solid: calling a looming error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. Then, too, the raise-or-waive rule prevents sandbagging; for instance, it precludes a party from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error (or, even worse, planting an error and nurturing the seed as insurance against an infelicitous result). So viewed, the requirement that parties raise contemporaneous objections to improper questions, comments, and the like serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*Unites States v. Taylor*, 54 F.3d 967, 972 (1st Cir. 1995) (internal quotation marks omitted). This Court has recognized only two exceptions to this forfeiture rule: "first, where a party has made its position clear to the court previously and further objection would be futile; and second, where it is necessary to correct a fundamental error or prevent a miscarriage of justice. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999) (internal quotation marks omitted).

Ms. Webb-Edwards has not invoked the plain error rule to justify its failure to object to the District Court's failure to order the County to comply with the requirements of Rule 50(a)(2). Instead, Ms. Webb-Edwards contends that the evidence she presented in her case in chief was sufficient to demonstrate that

38

passing over Ms. Webb-Edwards was an adverse employment action. We are persuaded that Ms. Webb-Edwards has forfeited her right to challenge the County's contention on appeal that the evidence is insufficient to show that she suffered an adverse employment action.

**B**

Ms. Webb-Edwards seeks reversal of the District Court's order granting judgment as a matter of law regarding her gender discrimination claim. To prove the elements of a cause of action for gender discrimination, a plaintiff must demonstrate four things: "(1) that she was a member of a protected class, (2) that she was qualified for the job, (3) that she suffered an adverse employment action, and (4) that she was displaced by someone outside the protected class." *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

The Supreme Court has defined an adverse employment action as follows: "A tangible employment action constitutes significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). This Court held in *Davis v. Town of Lake Park Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001), that "not

all conduct by an employer negatively affecting an employee constitutes adverse employment action." This Court also held in *Davis* that:

> to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significant adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id*. at 1239.

Ms. Webb-Edwards contends that the District Court erred in concluding that an assignment to the position at Gateway Middle School would have resulted in a lateral transfer that "did not represent a serious and material change in the pay, prestige, or responsibility of Plaintiff's employment with Defendant." Order Granting Rule 50(a) Mot., May 4, 2007, at 10.[4]

In *Gupta*, this Court held that "[w]hether an action is sufficient to constitute an adverse employment action must be determined on a case by case basis." *Gupta*, 212 F.3d at 587. The record shows that Ms. Webb-Edwards successfully applied for a transfer to the position of a SRO to fill a vacancy at any school.

---

[4] In its order granting the County's Rule 50(a) motion, the District Court concluded that Ms. Webb-Edwards demonstrated direct evidence of gender discrimination. During oral argument, counsel for the County conceded that the evidence of gender discrimination was sufficient.

She testified she applied because it was her intention to become a SRO at Sea Breeze High School when she entered the police academy in 1995. Commander Chatman testified that a deputy can be transferred to any SRO position that becomes available. If, however, a deputy who rejects a transfer to an available school is taken off the eligibility list to avoid "shopping around." Commander Chatman testified that at schools other than Gateway Middle School, a SRO's duties include teaching "gang resistance" to the students. She also testified that a SRO does not have time to teach. A SRO's job duties at Gateway Middle School are different from schools such as Conway Middle School because the SRO is engaged full time in breaking up fights on school grounds. She also stated that a majority of the students at Gateway Middle School have "criminal charges" and psychological or behavioral problems, as well as being on medication. Commander Chatman had previously recommended that two deputies be assigned to Gateway Middle School "for safety reasons."

Chief Hollomon testified that he deviated from the eligibility ranking submitted by the transfer review board because he believed that she was not qualified to serve as a SRO at Gateway Middle School because of its "very unique situation" when compared to other schools. He stated that she did not have the "physical stature and tactical background and training" to handle fourteen to

41

twenty-two year-old students with severe behavioral and medical problems as well as criminal records for violent crimes. He testified that forty-three students had been arrested on the Gateway Middle School campus for battery on a law enforcement officer. In his opinion, Ms. Webb-Edwards would not have been safe as the lone SRO at Gateway Middle School. He testified that his sole intention in deviating from the transfer ranking was to "protect Elaine [Webb-Edwards]."

This Court held in *Impact v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990), that a discrimination regarding which applicant is the best qualified for a position can be based on a comparison of personal and "technical training" characteristics. In passing over Ms. Webb-Edwards, Chief Hollomon relied on his comparison of her small stature and her lack of SWAT experience with Deputy Sheriff Leone's larger physical size and his service on a SWAT team whose primary duty is to capture armed or assaultive suspects.

When Ms. Webb-Edwards was passed over from being transferred to Gateway Middle School, she remained on the list for transfer to the next vacancy. She was offered the position of SRO at Conway Middle School. Unlike the dangerous conditions facing a SRO on a daily basis at Gateway Middle School, the SRO at Conway Middle School has the opportunity to counsel, mentor, and teach, as well as act as a coach in after-school activities. Chief Hollomon's deviation

42

from the transfer review board's ranking of SRO candidates did not affect Ms. Webb-Edwards's eligibility to be transferred to a SRO position at a school other than Gateway Middle School. In fact, she was offered a transfer to Conway Middle School approximately fifteen days after she was notified that she would not be transferred to Gateway Middle School. Thus, she refused to accept a transfer to a school that would have provided her with a safe environment and the ability to teach and coach an athletic team. Her refusal to accept a transfer to Conway Middle School made her ineligible to accept a SRO position based on the current eligibility ranking of applicants.

The evidence regarding the physical danger faced by a SRO at Gateway Middle School was not disputed by Ms. Webb-Edwards, nor was the fact that her desire to teach and participate in school activities was not possible at that school. There is no evidence in the record that a reasonable person faced with a choice of remaining as a property detective with an occasional encounter with a perpetrator resisting arrest would prefer being transferred to a position where she faced the daily threat of being physically assaulted at a school populated by students as old as twenty-two, the majority of whom had been placed at that school because of their criminal activity and their disturbed medical condition.

The record in this case does not demonstrate that passing over Ms. Webb-Edwards resulted in a serious and material change in the terms, conditions, and privileges of employment. Her wages, benefits, or rank were not affected. More importantly, a transfer to Gateway Middle School would have placed her in constant danger of physical assault. She did not present any evidence that she faced less of a threat of harm in her position as a property detective.

Ms. Webb-Edwards's reliance on *Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007), is misplaced. In *Alvarado*, the Fifth Circuit reversed the district court's grant of summary judgment because it concluded there was sufficient evidence that the position of Texas Rangers was a promotion because it was more prestigious than that of being a sergeant in the Special Crimes Service Division of the Department of Public Safety. *Id*. at 614-15. Here, no evidence was presented that service as a SRO at a school such as Gateway Middle School where the total responsibility of a SRO is to spend each day breaking up fights and attempting to avoid violent assaults, is more prestigious than serving as a property detective who may be required on an occasional basis to capture a suspect who attempts to escape arrest.

Accordingly, we conclude that Ms. Webb-Edwards has failed to demonstrate that Chief Hollomon's deviation from the transfer review board's rank was an

adverse employment action. The District Court did not err in granting the County's Rule 50(a) motion to dismiss Ms. Webb-Edward's gender discrimination claim.

## IV

The County has cross-appealed from the District Court's alternative order of awarding Ms. Webb-Edwards $50,000 in the event that this Court should disagree with the entry of a Rule 50(a) judgment as a matter of law regarding her gender discrimination claim. Because we have determined that the District Court did not err in granting the County's Rule 50(a) motion, we dismiss the County's cross-appeal as moot.

## Conclusion

The summary judgment granted in favor of the County on Ms. Webb-Edwards's sexual harassment and retaliation claims is **AFFIRMED**. The order granting judgment as a matter of law on her gender discrimination claim is also **AFFIRMED**. The County's provisional cross-appeal is **DISMISSED** as moot.